*Attorney Grievance Commission of Maryland v. Dawn R. Jackson*, Miscellaneous Docket AG No. 9, September Term, 2020, Opinion by Booth, J.

**ATTORNEY DISCIPLINE – SANCTIONS –** This attorney grievance matter involves an attorney who is licensed in the District of Columbia and not in Maryland. The attorney is a partner in a law firm that employs Maryland attorneys. In 2014, the attorney moved the law firm's office from the District of Columbia to Maryland. In 2015, the Office of Bar Counsel met with the attorney in her office and made specific recommendations for maintaining an office in Maryland. Three and one-half years later, after receiving an anonymous complaint, the Attorney Grievance Commission opened an investigation into the attorney's alleged unauthorized practice of law. Although the Court of Appeals concluded that the attorney violated the Maryland Attorneys' Rules of Professional Conduct ("MARPC") 19-305.5, the Court determined that, given the significant and unusual mitigating factors that were present in this case, it would impose no sanction and that dismissal of the proceeding was appropriate.

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 9

September Term, 2020

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

DAWN R. JACKSON

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S.
 (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Filed:  January 31, 2022

Suzanne C. Johnson, Clerk

In this attorney grievance proceeding, the Respondent, Dawn Jackson, is a lawyer admitted to the District of Columbia Bar who is not licensed in Maryland. She is a partner in a law firm, Jackson & Associates. In addition to Ms. Jackson, the law firm also employs Maryland attorneys. In 2014, the law firm relocated from the District of Columbia to Maryland. In 2015, Senior Assistant Bar Counsel Dolores Ridgell met with Ms. Jackson in Ms. Jackson's Maryland office. During that meeting, Ms. Ridgell made specific recommendations to Ms. Jackson concerning how to maintain her Maryland office in accordance with the Maryland rules of professional conduct. Ms. Jackson incorporated Ms. Ridgell's recommendations and continued to practice law from her Maryland office. She limited her own practice to matters arising under District of Columbia laws, where she was barred, while also performing administrative matters for the law firm.

Three and one-half years after Ms. Ridgell's visit to Ms. Jackson's law office, Bar Counsel commenced this investigation on September 19, 2018, after receiving material from an anonymous source. On April 7, 2020, the Attorney Grievance Commission ("Commission"), through Bar Counsel, filed a Petition for Disciplinary or Remedial Action, pursuant to Maryland Rule 19-721, against Ms. Jackson, alleging that she violated numerous provisions of the rules of professional conduct.[1] These included alleged

---

[1] During much of the period relevant to this case, the ethical rules governing attorneys were entitled the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and were codified in an appendix to Maryland Rule 16-812. Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules without substantive changes. *See* Maryland Rules 19-300.1 *et seq.* We shall use the current codification of those rules in this opinion. Additionally, for readability, we will use shortened references – *i.e.*, Maryland Rule 19-301.1 will be referred to as Rule 1.1.

violations of Rule 1.1 (competence); Rule 1.3 (diligence); Rule 1.4 (communication); Rule 1.16 (declining or terminating representation); Rule 3.3 (candor toward the tribunal); Rule 3.4 (fairness to opposing party and attorney); Rule 5.1 (responsibilities regarding non-attorney assistants); Rule 5.5 (unauthorized practice of law; multi-jurisdictional practice of law); Rule 8.1(a) (bar admission and disciplinary matters); and Rule 8.4(a), (b), (c), and (d) (misconduct). Bar Counsel also charged Ms. Jackson with violating sections 10-206 and 10-601 of the Business Occupations and Professions Article ("BOP") of the Maryland Code. Bar Counsel later withdrew the charges related to competence and diligence.

Pursuant to Rule 19-722(a), we designated Judge Lawrence V. Hill, Jr. of the Circuit Court for Prince George's County ("the hearing judge") to conduct a hearing concerning the alleged violations and to provide findings of fact and conclusions of law. Following a hearing in January 2021, the hearing judge concluded that Ms. Jackson violated Rule 5.5 by engaging in the unauthorized practice of law in Maryland. The hearing judge further concluded that there was insufficient evidence to establish violations of Rule 1.4, Rule 1.16, Rule 3.3, Rule 3.4, Rule 5.1, Rule 5.3, Rule 8.1(a), Rule 8.4(a)–(d), BOP § 10-206 and BOP § 10-601.

This Court has original and complete jurisdiction in attorney discipline proceedings and conducts an independent review of the record. *Attorney Grievance Comm'n v. Ambe,* 425 Md. 98, 123 (2012) (internal citations omitted). We review the hearing judge's findings of fact under the clearly erroneous standard. *Id.* When no exceptions are filed to a hearing judge's findings of fact, we accept them as established. Md. Rule 19-740(b)(2)(A). Additionally, we "may confine [our] review to the findings of fact

2

challenged by the exceptions." Md. Rule 19-740(b)(2)(B). In this case, Bar Counsel did not file any exceptions to the hearing judge's findings of fact, and Ms. Jackson excepts to only one factual finding. We summarize below the hearing judge's findings of fact and other undisputed matters in the record, as they relate to the alleged violations, and we address the one factual exception as part of our discussion.

## I

### Facts

#### *Ms. Jackson's Bar Admissions*

Ms. Jackson was admitted to the New Jersey Bar in 2001 and the District of Columbia Bar in 2004. She is not, and never has been, licensed to practice law in Maryland.

#### *Ms. Jackson's Law Practice with Brynee Baylor – Baylor & Jackson*

From 2001 through 2011, Ms. Jackson and Brynee Baylor were partners in the law firm of Baylor & Jackson, PLLC ("the Baylor & Jackson law firm"), which maintained an office for the practice of law in the District of Columbia. Ms. Baylor was licensed to practice in both Maryland and the District of Columbia. The law firm also employed associate-attorneys, Chervonti Jones and Tiffany Sims, both of whom were licensed to practice law in Maryland. Ms. Jackson's practice focused on clients and legal matters arising in the District of Columbia, and Ms. Baylor handled cases in both jurisdictions where she was licensed, with the assistance of the associate-attorneys who were also licensed in Maryland.

Ms. Jackson and Ms. Baylor supervised the associate-attorneys. Ms. Jackson was also responsible for the firm's administrative responsibilities, including maintaining the firm's trust account, entering leases and other contracts on behalf of the law firm, hiring

3

staff, and other administrative functions. Ms. Jackson also served as a key resource for other members of the law firm. The attorneys in the firm would consult her on an as needed basis to calculate case expenses and the clients' net recovery on contingency fee cases. Ms. Jackson assisted with the preparation of settlement sheets, itemizing the deductions from the clients' gross recovery.

### SEC Case Against Brynee Baylor

At some point prior to November 2011, the Securities and Exchange Commission ("SEC") commenced an investigation of Ms. Baylor for securities fraud. According to the SEC, Ms. Baylor helped perpetrate a securities fraud scheme in which Ms. Baylor posed as counsel to one of her co-defendants to lend an air of legitimacy to the scheme and masked some of her proceeds of the fraudulent funds as attorney's fees, which she laundered through the Baylor & Jackson law firm. After unsealing a complaint against Ms. Baylor on November 30, 2011, the SEC contacted Ms. Jackson via telephone and advised her of the case that it had filed against her partner. The SEC informed Ms. Jackson that it had seized the law firm's operating account and her personal account, thus making it impossible for Ms. Jackson to pay staff or support her family.

Ms. Jackson was named as a "relief defendant" in the SEC fraud litigation against Ms. Baylor, and spent the next few years helping the agency recover money for Ms. Baylor's victims. The SEC case resulted in the entry of a judgment in 2013 against Ms.

Baylor, the Baylor & Jackson law firm, and other co-defendants for over $2.6 million, which was upheld on appeal that concluded in 2015.[2]

The hearing judge found that, in the aftermath of the SEC's November 2011 telephone call, Ms. Jackson was overwhelmed with obligations to her family, her staff, the SEC, and attorney disciplinary authorities in Washington, D.C. and Maryland (who had opened disciplinary investigations into Ms. Baylor). After being told that federal officials had frozen her firm's operating account, Ms. Jackson testified that she became "emotionally [] distraught," describing herself as a "zombie trying to keep everything together." Ms. Jackson testified about the physical and emotional toll that Ms. Baylor's scandal had on her personal and professional life. Portions of Ms. Jackson's medical records were admitted into evidence. As part of our consideration of the mitigating factors found by the hearing judge in this case, we shall discuss in more detail the personal and

---

[2] The SEC sued Ms. Baylor, the Baylor & Jackson law firm, the Milan Group, Inc., and other individuals as "Principal Defendants" for conducting an alleged securities fraud from which victims suffered losses amounting to millions of dollars. *See S.E.C. v. Milan Group*, 962 F. Supp. 2d 182 (D.D.C. 2013), *aff'd in part, vacated in part,* 595 Fed. Appx. 2 (D.C. Cir. 2015). Ms. Jackson was named as a "Relief Defendant," which the District Court described as a "person[] who allegedly received money resulting from the fraudulent activities but who [is] not charged with personally engaging in the fraud." *Milan Group*, 962 F. Supp. 2d at 186. During the pendency of the case and trial, the SEC required that Ms. Jackson keep the Baylor & Jackson law firm intact as "a going concern" to preserve the law firm's accounts and assets that would eventually contribute toward the monetary judgment to satisfy the victims' monetary losses. The District Court entered summary judgment against Ms. Baylor, the Baylor & Jackson law firm, and other defendants jointly and severally liable for over $2.6 million in ill-gotten profits. *Id.* at 211. The money judgment was affirmed by the United States Court of Appeals for the District of Columbia Circuit in 2015. *Milan Group*, 595 Fed. Appx. at 2.

emotional problems that Ms. Jackson suffered as a result of Ms. Baylor's fraudulent actions.

Despite the SEC's civil and criminal investigation into Ms. Baylor, she remained licensed in Maryland and in the District of Columbia for years after the complaints and indictment were unsealed. Ms. Jackson testified that, during the initial transition period in 2011 and 2012, she had no way to deny Ms. Baylor access to the office or to client files because Ms. Baylor was licensed to practice law, and Ms. Jackson was required by the SEC to maintain the Baylor & Jackson law firm as a going concern. Ms. Baylor continued to have keys to the office and could access her desktop computer by logging in remotely.

### *Ms. Jackson's Formation of a New Firm – Jackson & Associates*

During this transition period—beginning in late 2011 or early 2012, as Ms. Jackson was cooperating with the SEC to preserve the Baylor & Jackson law firm as a going concern, and ultimately winding it down to satisfy the judgment—Ms. Jackson formed a new law firm, Jackson & Associates Law Firm, PLLC ("Jackson & Associates"). From 2011 until sometime in 2014, Ms. Jackson operated her new law firm from the same office space in the District of Columbia, where she continued to perform the same administrative responsibilities, with the same attorneys (except Ms. Baylor) and staff that had previously been employed at the Baylor & Jackson law firm.

### *Jackson & Associates Moves Its Office from the District of Columbia to Maryland*

When their lease expired, in the spring of 2014, Jackson & Associates moved its office from its District of Columbia location to an office in Upper Marlboro, Maryland. Ms. Jackson continued to focus on cases arising in the District of Columbia, while the

Maryland lawyers who were employed by the firm, Tiffany Sims, Pamela Ashby, and Victoria Adegoke, handled Maryland cases. After the office relocated from the District of Columbia to Maryland, Ms. Jackson continued to perform the same administrative responsibilities for the law firm that she always had—such as maintaining the trust account, entering contracts, overseeing the hiring of staff, and computing clients' recoveries in contingency cases.

***Bar Counsel's Investigation into Brynee Baylor and Site Visit to Ms. Jackson's Maryland Office***

After a lengthy investigation, Bar Counsel filed disciplinary charges against Ms. Baylor on November 24, 2014.[3] Ms. Baylor was ultimately disbarred by order of this Court pursuant to a joint petition for disbarment. *Attorney Grievance Comm'n v. Baylor*, 443 Md. 229 (2015). In preparation for the disciplinary case against Ms. Baylor, Senior Assistant Bar Counsel Dolores Ridgell ("Senior Assistant Bar Counsel" or "Ms. Ridgell") met with Ms. Jackson on two occasions. These meetings occurred on March 13, 2015 at Bar Counsel's office in Crownsville, and on June 5, 2015 at Ms. Jackson's office in Upper Marlboro, Maryland. Although the purpose of the second meeting was to prepare for the Commission's disciplinary case against Ms. Baylor, in the context of that meeting, Senior Assistant Bar Counsel and Ms. Jackson discussed the fact that Ms. Jackson was operating her law practice from an office in Maryland. Ms. Jackson's attorney, Stephan Brennan, was also present at the meeting, and corroborated Ms. Jackson's recollection of the

---

[3] Bar Counsel never charged Ms. Jackson with professional misconduct in connection with the facts and circumstances leading to Ms. Baylor's disbarment.

7

substance of the discussion between Ms. Ridgell and Ms. Jackson concerning Ms. Jackson's practice of law from the Maryland office.

During this June 5, 2015 meeting, Ms. Jackson and Ms. Ridgell discussed the proper safeguards for Ms. Jackson to put into place in order to maintain an office in Maryland since she was not a Maryland attorney. Ms. Jackson testified that she recalled Ms. Ridgell stating "[t]hat we always had to have a Maryland attorney on staff" and that her "business cards and letterhead needed to reflect that I was not licensed in Maryland . . . but licensed in D.C." Ms. Jackson testified that she took Ms. Ridgell's advice, and promptly placed this disclaimer on her firm's letterhead, website profile, email signature, and her business card. The hearing judge determined that Ms. Jackson made these changes in response to her discussion with Bar Counsel. The signs in the lobby and outside the office door of the Maryland office, however, did not disclose that Ms. Jackson was not barred in Maryland.

In 2020 (after Bar Counsel initiated this investigation), Ms. Jackson opened a second office for Jackson & Associates in the District of Columbia. The hearing judge found that, after establishing this second office, Ms. Jackson continued to work in both the District of Columbia office and the Maryland office in Upper Marlboro.

### *Bar Counsel's Investigation and Disciplinary Charges Against Dawn Jackson*

In September 2018—over three and one-half years after Senior Assistant Bar Counsel Ridgell's visit to Ms. Jackson's Maryland law office—Bar Counsel opened an investigation into Ms. Jackson's law practice after receiving an anonymous complaint. On October 17, 2018, Bar Counsel wrote to Ms. Jackson advising her that "[i]t has come to the attention of this office that you may be engaged in the unauthorized practice of law."

8

In the letter, Bar Counsel directed Ms. Jackson to "respond in writing indicating" why she believed that the establishment of Jackson & Associates' Maryland office location complied with Rule 5.5(b)(1). In addition to Bar Counsel's general concern related to the law firm's office location, Bar Counsel asked Ms. Jackson to explain her alleged participation in two Maryland cases. Bar Counsel's letter advised Ms. Jackson that Bar Counsel, as well as the Maryland Attorney General, was authorized to investigate, and, if necessary, seek injunctive relief against "anyone engaged in the unauthorized practice of law." Bar Counsel also pointed out that "there are criminal penalties for such conduct."

On December 3, 2018, Ms. Jackson, through her counsel, Mr. Brennan, submitted a detailed seven-page response to Bar Counsel, which attempted to address Bar Counsel's general concerns related to Ms. Jackson's Maryland office location, as well as Bar Counsel's specific inquiries related to the two client matters.

With respect to general concerns related to Jackson & Associates' office location in Maryland, Mr. Brennan recounted the SEC investigation and disciplinary proceeding against Ms. Baylor, and Ms. Jackson's full cooperation with Bar Counsel. Mr. Brennan reminded Bar Counsel's office that he had represented Ms. Jackson throughout the proceedings involving Ms. Baylor, including his representation of Ms. Jackson as a witness in Bar Counsel's case against Ms. Baylor, and pointed out that he had personal knowledge of much of the information contained in the letter.

Mr. Brennan described the relocation of Jackson & Associates' office from the District of Columbia to Maryland in 2014, pointing out that the firm employed three lawyers licensed to practice in Maryland. Mr. Brennan enclosed documentation confirming that the

9

Jackson & Associates website, Ms. Jackson's letterhead, business cards, and email contact information reflected that Ms. Jackson was not admitted to practice law in Maryland, but that she is admitted in the District of Columbia and New Jersey.

As for the two client matters raised by Bar Counsel in its letter, Mr. Brennan explained that the clients represented in those cases were not represented by Ms. Jackson but were instead represented by other members of the law firm who were licensed in Maryland. Mr. Brennan enclosed copies of the pleadings that had been filed in each case, which confirmed that Ms. Jackson was not counsel in either case. In one case that we will discuss below—the "Yenchochic case"—Mr. Brennan acknowledged that two lines had been filed in that case seeking the reissuance of a summons, which appeared to bear Ms. Jackson's signature. However, Mr. Brennan stated that Ms. Jackson had no recollection of signing them. Mr. Brennan pointed out that the lines were filed in 2012 after the SEC investigation into Ms. Baylor came to light, which was a "very disruptive, stressful and tumultuous time" for Ms. Jackson. Despite the absence of any memory of signing these lines, Ms. Jackson acknowledged that it was "possible" that the lines were signed by her, during this tumultuous period when she was "moving too fast and not paying enough attention at a time when she was asked to sign a large number of papers in a large number of cases."[4]

---

[4] In his letter to Bar Counsel, Mr. Brennan also addressed Bar Counsel's inquiry concerning another client-related matter involving Michelle Lyons. Although Bar Counsel's charges included this second client matter, the hearing judge determined that Bar Counsel failed to prove that Ms. Jackson "took any action" in connection with the Lyons matter. Bar Counsel did not file exceptions to the hearing judge's findings of fact pertaining to these

Mr. Brennan concluded by stating that, other than Ms. Jackson's "possible mistake" in signing two lines requesting that a summons be reissued in one of Ms. Baylor's cases in the aftermath of the SEC investigation, he was "confident that it was an isolated occurrence that ha[d] not reoccurred in the past six years." On behalf of his client, Mr. Brennan concluded by stating that he had "attempted to provide a thorough response to Bar Counsel's concerns, and that he and Ms. Jackson remained willing to cooperate in Bar Counsel's investigation."

Despite Ms. Jackson's response to Bar Counsel's letter and willingness to cooperate, Bar Counsel initiated formal charges,[5] which resulted in the evidentiary hearing before

---

charges. Accordingly, we shall not discuss them further. *See* Md. Rule 19-740(b)(2)(B) (we "may confine [our] review to the findings of fact challenged by the exceptions[]").

[5] The record before the hearing judge in this matter included portions of Bar Counsel's responses to Ms. Jackson's request for admissions ("admissions"). In the admissions, Bar Counsel admits that on February 11, 2020, Ms. Jackson requested additional information from the Office of Bar Counsel concerning what additional steps, if any, she could undertake to ensure compliance with her ethical obligations. According to Bar Counsel's admissions, Bar Counsel did not respond to Ms. Jackson's letter because its office "does not provide legal advice." Instead, the Commission proceeded to file this Petition in April 2020.

Although Bar Counsel's current policy is not to offer what it considers to be "legal advice" on compliance related matters, it has not always been that office's policy. At the evidentiary hearing, Ms. Jackson attempted to introduce the deposition transcript of Glenn M. Grossman, who was Bar Counsel from July 2010 – July 2017, to demonstrate what Bar Counsel's policy had been during the time period covering some of the charges. Counsel for Ms. Jackson deposed Mr. Grossman on November 12, 2020, which Bar Counsel's office attended. Because Mr. Grossman resided in Florida at the time of the evidentiary hearing, Ms. Jackson's counsel offered portions of his deposition transcript into evidence pursuant to Maryland Rule 2-419(a)(3)(B). This rule permits the deposition of a witness to "be used by any party for any purpose against any other party who was present or represented at the taking of the deposition or who had due notice thereof, if the court finds: . . . that the witness is out of the State, unless it appears that the absence of the witness was procured by the party offering the deposition." The hearing judge sustained Bar

Judge Hill. As previously noted, the hearing judge found only one violation of Rule 5.5(a)—related to two lines filed in the Yenchochic case discussed below.

### *Representation of Michelle Yenchochic*

Michelle Yenchochic retained the Baylor & Jackson law firm for her representation in an uncontested divorce with her then-husband Roger Diaz. In May 2011, Ms. Baylor filed the complaint on Ms. Yenchochic's behalf in the Circuit Court for Montgomery County. The hearing judge found that Ms. Baylor was Ms. Yenchochic's counsel of record for the duration of her case. Ms. Baylor's assistant served as the liaison with the client. To Ms. Yenchochic's recollection, she only worked with two attorneys—Ms. Baylor and later, Tiffany Sims—both of whom were licensed to practice in Maryland. Ms. Sims appeared on behalf of Ms. Yenchochic at her divorce proceedings in December 2012 and January

---

Counsel's objection to the introduction of Mr. Grossman's deposition transcript, reasoning that the witness could have "Zoomed in from Naples." Ms. Jackson excepts to the hearing judge's failure to admit the deposition testimony into evidence. We sustain this exception. Ms. Jackson was entitled to admit Mr. Grossman's deposition transcript pursuant to Maryland Rule 2-419(a)(3)(B) because the deposition was properly noted, Bar Counsel attended the deposition, Mr. Grossman was out of the State, and Ms. Jackson did not procure his absence. There is no "Zoom exception" to the witness unavailability rules, and Ms. Jackson was entitled to rely upon the Maryland Rules as written.

Mr. Grossman's deposition testimony highlights the policy changes in the Office of Bar Counsel during the period between Ms. Ridgell's 2015 visit to Ms. Jackson's office and the filing of charges in this matter in 2020. Mr. Grossman acknowledged that "there were a number of ways that I pursued [the job of protecting the public.]" Although "one way was to prosecute those who violated the Rules of Professional Conduct[,] . . . another way was to educate lawyers on their ethical obligations so that they wouldn't have to get into trouble and the public would be protected in that way." When asked whether staff counsel such as Ms. Ridgell would "have occasion to engage in a dialogue with attorneys to help them meet their ethical obligations," Mr. Grossman confirmed that such a practice "would happen" during his tenure as Bar Counsel.

2013. The hearing judge found that Ms. Sims properly appeared in Ms. Yenchochic's divorce proceeding, obtained a judgment of absolute divorce on her client's behalf, and closed the case.

The hearing judge found that Ms. Jackson had no contact with Ms. Yenchochic regarding her divorce case. Ms. Yenchochic testified that she "never dealt with Dawn Jackson," "never met her," "never spoke to her," never exchanged emails with her, and had no knowledge of her participation in any aspect of the divorce proceedings.

The only involvement that Ms. Jackson had with Ms. Yenchochic's case involved the filing of two lines bearing Ms. Jackson's signature—one in March 2012 and a second in September 2012—requesting the reissuance of summons, after Ms. Baylor encountered difficulty serving Mr. Diaz. The hearing judge found that Ms. Jackson had no recollection of the Yenchochic case "at all[,]" nor did she recall signing the forms "close to a decade ago." The hearing judge credited Ms. Jackson's testimony that, amid the SEC scandal, her life in 2012 "was a blur. I was literally a zombie trying to keep everything together." The hearing judge found that Ms. Jackson had no idea as to how her signature was included on the two lines that were filed "close to a decade ago" and that her lack of memory was "very reasonable." Despite her lack of recollection, the hearing judge determined that Ms. Jackson "admitted to the authenticity of her signature."

Ms. Jackson's sole exception to the hearing judge's factual findings in this matter relates to his finding that Ms. Jackson signed the lines requesting the reissuance of a summons in the Yenchochic case. She argues that Bar Counsel failed to meet its burden of proving by clear and convincing evidence that she, in fact, signed the forms. She

13

contends that the hearing judge's findings on this point are somewhat inconsistent, noting that the hearing judge found that, given the passage of time, it places Ms. Jackson in "the awkward position of trying to defend her actions when, in fact, she cannot recall them either." She points out that the hearing judge found her "recollection or lack thereof to be very reasonable" and recognized the difficulty that this posed in his fact finding. Although this is a close case given Bar Counsel's burden, we overrule Ms. Jackson's exception. We cannot say, on this record, that the hearing judge's factual finding was clearly erroneous. Based upon our review of the record, the hearing judge found Ms. Jackson's testimony to be very reasonable and credible on every point, including her admission that the signature on these forms that were executed eight years prior to the hearing appeared to be hers, which were signed at a chaotic period in her life, the circumstances of which were not of her own making.[6]

---

[6] Ms. Jackson urges us to exercise our discretion to dismiss these charges based upon the equitable doctrine of laches. Although we have never applied laches in the context of an attorney grievance proceeding, we have recognized that the defense may apply where prejudice to the attorney or other circumstances make it "inequitable to grant the relief sought." *Attorney Grievance Comm'n v. Penn*, 431 Md. 320, 335 (2013) (citations omitted). Although this is a closer case than those in which we have previously considered the equitable defense, *see e.g.*, *id.*; *Attorney Grievance Commission v. Cassilly*, 476 Md. 309 (2021); *Attorney Grievance Commission v. Kahn*, 290 Md. 654 (1981); *Anne Arundel Bar Association v. Collins*, 272 Md. 578 (1974), we decline to apply the doctrine here, given that we have considered Bar Counsel's extraordinary delay in pursuing charges against Ms. Jackson as part of the mitigating factors in this case, and are exercising our discretion to impose no sanction in this case.

## II

## Hearing Judge's Conclusions of Law

At the start of the evidentiary hearing, Bar Counsel voluntarily dismissed charges against Ms. Jackson for violations of Rules 1.1 and 1.3. As previously noted, the hearing judge determined that Bar Counsel failed to meet its burden of establishing by clear and convincing evidence that Ms. Jackson violated Rules 1.4, 1.16, 3.3, 3.4, 5.1, 5.3, 8.1(a), 8.4(a), (b), (c), and (d), and BOP § 10-206 and BOP § 10-601 pertaining to the unauthorized practice of law. The hearing judge concluded that the only violation that Bar Counsel established was a violation of Rule 5.5(a)—arising from Ms. Jackson filing two lines in the Yenchochic case requesting the reissuance of a summons. Based upon this act, the hearing judge determined that Ms. Jackson "did to the lowest degree engage in the unauthorized practice of law by signing a [l]ine." Reiterating that the act of filing of a "[l]ine is a highly technical act," the hearing judge concluded that it was nonetheless a violation of Rule 5.5(a).

We conduct a de novo review of the hearing judge's conclusions of law. Md. Rule 19-740(b)(1). Neither party filed exceptions to the majority of the hearing judge's conclusions that there was insufficient evidence to find a violation of the professional rules as charged. With respect to the legal conclusions for which no exceptions were filed by either party, based upon our independent review of the record, we agree with the hearing judge's conclusions that Bar Counsel failed to establish a violation of these rules by clear and convincing evidence, and we see no reason to elaborate further. We shall focus on the conclusion of law for which exceptions have been lodged.

15

Both parties have filed exceptions to the hearing judge's conclusions concerning Rule 5.5. Notwithstanding the hearing judge's characterization of the violation as being a "highly technical" one, Ms. Jackson excepts to the hearing judge's conclusion that she violated the rule at all. Bar Counsel excepts to the hearing judge's failure to find more violations of Rule 5.5 based upon the undisputed facts. Bar Counsel also excepts to the hearing judge's failure to find a violation of Rule 8.4(a), (b), and (d), as well as BOP §§ 10-601 and 10-206. We start our discussion with Rule 5.5—the flagship violation from which all other charges and exceptions flow.

### Rule 5.5 – The Unauthorized Practice of Law

The crux of this attorney grievance case involves Rule 5.5 and the applicable provisions of the Business Occupations and Professions Article of the Maryland Code,[7] which prohibit attorneys who are not licensed in this State from engaging in the practice of law unless permitted by an exception set forth in the rule or statute.

Rule 5.5 provides in pertinent part:

(a) An attorney shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b) An attorney who is not admitted to practice in this jurisdiction shall not:

---

[7] BOP § 10-206(a) states that "[e]xcept as otherwise provided by law, before an individual may practice law in the State, the individual shall: (1) be admitted to the Bar; and (2) meet any requirements that the Court of Appeals may set by rule." BOP § 10-601(a) states that "[e]xcept as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar."

16

(1) except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or

(2) hold out to the public or otherwise represent that the attorney is admitted to practice law in this jurisdiction.

Rule 5.5 has four basic components.[8] First, paragraphs (a) and (b) set out the general

prohibitions against non-Maryland barred attorneys engaging in or assisting in the

---

[8] As noted, Rule 5.5(c), (d), and (e) permits an attorney who is not admitted in Maryland to provide legal services in the State only under the following circumstances:

(c) An attorney admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:

(1) are undertaken in association with an attorney who is admitted to practice in this jurisdiction and who actively participates in the matter;

(2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction, if the attorney, or a person the attorney is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized;

(3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in this or another jurisdiction, if the services arise out of or are reasonably related to the attorney's practice in a jurisdiction in which the attorney is admitted to practice and are not services for which the forum requires pro hac vice admission; or

(4) are not within subsections (c)(2) or (c)(3) of this Rule and arise out of or are reasonably related to the attorney's practice in a jurisdiction in which the attorney is admitted to practice.

(d)    An attorney admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services in this jurisdiction that:

   (1)    are provided to the attorney's employer or its organizational affiliates and are not services for which the forum requires pro hac vice admission; or

   (2)    are services that the attorney is authorized to provide by federal law or other law of this jurisdiction.

(e)(1)  In this section, "foreign attorney" means an attorney who (A) is not admitted to practice law in any United States jurisdiction, (B) is a member in good standing or a recognized legal profession in a country other than the United States and, as such, is authorized to practice law in that country, (C) is subject to effective regulation and discipline by a duly constituted professional body or a public authority of that country, and (D) has not been disbarred or suspended from the practice of law in any jurisdiction of the United States.

   (2)  A foreign attorney may not establish an office or other systematic and continuous presence in this State for the practice of law, or hold out to the public or otherwise represent that the attorney is admitted to practice law in this State.  Any violation of this provision or any material misrepresentation regarding the requirements in subsection (e)(1) of this Rule by the foreign attorney will subject the foreign attorney to liability for the unauthorized practice of law.

   (3)  A foreign attorney, with respect to any matter, may (A) act as a consultant to a Maryland attorney on the law and practice in a country in which the foreign attorney is admitted to practice, including principles of international law recognized and enforced in that country and (B) in association with a Maryland attorney who actively participates in the matter, participate in discussions with a client of the Maryland attorney or with other persons involved with the matter, provided that the Maryland attorney shall remain fully responsible to the client for all advice and other conduct by the foreign attorney with respect to the matter.

unauthorized practice of law, representing to the public that they are licensed in the jurisdiction, or establishing an office in the State. Second, paragraph (c) relaxes these prohibitions somewhat by allowing attorneys admitted in any United States jurisdiction (and not disbarred or suspended in any jurisdiction) to provide legal services on a temporary basis under certain enumerated conditions ("temporary services exception"). Third, paragraph (d) provides that an attorney admitted in another United States jurisdiction may provide legal services in Maryland that are provided to the attorney's employer or affiliate organization ("in-house counsel exception") or services that the attorney is authorized to provide under federal law ("federal practice exception") or law of this State ("state law exception").[9] Finally, paragraph (e) provides certain exceptions for "foreign attorneys" who are not admitted to practice law in any United States jurisdiction but who are members in good standing of a recognized legal profession in a country other than the United States.

In this case, Ms. Jackson argues that her office does not run afoul of Rule 5.5(a) and (b) because as a member of the Bar of the District of Columbia, her practice falls within the federal practice exception set forth in Rule 5.5(d). We will consider the application of the federal practice exception as part of our discussion of the Rule. But first, we start with the hearing judge's conclusions pertaining to Rule 5.5, starting with his conclusions related to the client-specific matter, followed by his conclusions related to Ms. Jackson's conduct generally by maintaining a practice in Maryland.

---

[9] BOP § 10-206(b) provides some state law exceptions to the unauthorized practice of law that are not pertinent here.

## A. *Rule 5.5(a) – Charges Arising from the Reissuance of a Summons*

The only violation of Rule 5.5 that the hearing judge found related to Ms. Jackson's conduct in filing the two lines requesting the reissuance of a summons in the uncontested Yenchochic divorce case in 2012 after Ms. Baylor's departure from the firm. The hearing judge determined that Bar Counsel met its burden of proving that Ms. Jackson signed the summons reissuance lines, concluding that Ms. Jackson sufficiently authenticated her signature by acknowledging that, although she did not recall signing them, the signatures "appeared" to be hers. Based upon this authentication, the hearing judge concluded that Ms. Jackson, "by her own admission did compose a 'form that was filed in a court.'" The hearing judge concluded that such an act fell within the statutory definition of the "practice of law." However, in reaching his conclusion, the hearing judge noted that "pro se parties file these same types of forms daily" and pointed out that "no degree of legal experience or knowledge is required to file a [l]ine to reissue [a summons]."

Ms. Jackson excepts to the hearing judge's conclusion that signing a line requesting that a summons be reissued constitutes the practice of law. Ms. Jackson points out that the hearing judge found the violation to be a technical one and observed that "no degree of legal experience or knowledge is required to file a line to reissue" a summons. Ms. Jackson also notes that the hearing judge found no evidence showing that she fundamentally participated in material elements" of this or any other case.

We agree with the hearing judge's characterization of the act of filing a pro forma line requesting the issuance of a summons as being a violation of Rule 5.5(a) in the most technical sense. The preparation of such a document does not require any degree of legal

20

experience, knowledge, or training. Nor is such a document considered to be a "pleading" as defined by the Maryland Rules. *See* Md. Rule 1-202(v). However, a line is a paper filed with the court. *See* Md. Rule 1-202(t). The Maryland Rules require that "[e]very pleading and paper of a party represented by an attorney shall be signed by at least one attorney who has been admitted to practice law in this State . . . ." Md. Rule 1-311(a). Ms. Jackson caused a line to be filed bearing her signature. We determine that this act of signing and filing the line constituted a violation of the Maryland Rules in violation of Rule 5.5(a) and overrule her exception.

### B. *Rule 5.5(a) and (b) – Charges Related to Ms. Jackson's Practice Generally*

Turning to Bar Counsel's charges that relate to Ms. Jackson's practice generally, the hearing judge concluded that Bar Counsel had not proven that Ms. Jackson violated Rule 5.5 by generally engaging in the unauthorized practice of law. Concerning testimony from Ms. Jackson and the Maryland attorneys in the law firm that they would engage in general interoffice discussions, the hearing judge concluded as follows:

> Regarding [Ms. Jackson's] advice or discussing matters with a Maryland attorney, the [c]ourt finds no violation. There is nothing in the Rules that prohibit[s] a Maryland attorney from seeking the opinion of a non-Maryland barred attorney. Therefore, the [c]ourt finds there is no violation to providing advice to a barred Maryland attorney.

As for Bar Counsel's Rule 5.5 charges related to Ms. Jackson's physical presence in Maryland, the hearing judge concluded that Bar Counsel had not met its burden in proving that Ms. Jackson "maintained a systematic and continuous presence in Maryland for the practice of law[.]" The hearing judge noted that, although Ms. Jackson "maintained an office for the practice of law" in Maryland, which was also the firm's address, "there

21

was no evidence that [Ms. Jackson] held herself out as a Maryland attorney." The hearing judge also pointed out that "[a]t all times, she had a Maryland attorney on staff" and observed that "[a]nyone in the public who saw the firm listed in the lobby of the building, website, advertising, and/or business cards could meet and consult with a Maryland attorney." (Cleaned up). The hearing judge commented on the fact that, "although going back years, [Bar Counsel] did not produce one witness who testified they were told [that Ms. Jackson] was a Maryland attorney or sat and consulted with [Ms. Jackson] in the Maryland office." In reaching his conclusion, the hearing judge also found it noteworthy that Ms. Ridgell met with Ms. Jackson in 2015 and that the Office of Bar Counsel was aware that Ms. Jackson had established her office in Maryland by that time. The hearing judge pointed out that Bar Counsel had not called their former colleague to testify in this matter. The hearing judge commented that, despite Ms. Ridgell's knowledge of Ms. Jackson's office and physical presence in the State, she did not take any action to stop it or to follow up to ensure that "no systematic presence occurred."

Bar Counsel excepts to the hearing judge's failure to find additional Rule 5.5 violations over and above the technical violation involving the lines for reissuance of the summons. For ease of discussion, we categorize Bar Counsel's exceptions into three buckets of alleged misconduct based upon undisputed facts. In the first exceptions bucket, Bar Counsel contends that the hearing judge erred by failing to conclude that Ms. Jackson *actually* engaged in the unauthorized practice of law. In the second bucket, Bar Counsel asserts that the hearing judge erred in failing to conclude that Ms. Jackson *held herself out to the public* as being admitted to practice law in Maryland. In the third and final bucket,

Bar Counsel asserts that the hearing judge erred in failing to conclude that Ms. Jackson violated Rule 5.5(b)(1) by *maintaining an office* in Maryland.[10]

1. <u>Bar Counsel's Exceptions Related to Rule 5.5(a) Charges that Ms. Jackson Engaged in the "Unauthorized Practice of Law"</u>

Bar Counsel contends that Ms. Jackson engaged in the unauthorized practice of law in violation of Rule 5.5(a) by: (1) determining fees to be charged by the Maryland attorneys in the law firm for Maryland cases; (2) preparing settlement sheets in Maryland cases that itemized expenses and documented the clients' recovery; and (3) attending settlement conferences or mediations in Maryland cases. Bar Counsel contends that these "undisputed facts provide additional grounds for violations of Rule 5.5(a)." For these undisputed facts to form the basis of a Rule 5.5 violation, we must first determine whether such acts constitute the "practice of law."

Although Rule 5.5 prohibits the unauthorized practice of law, it doesn't define it, and with good reason. We have "found it difficult to craft an all-encompassing definition." *Attorney Grievance Comm'n v. Hallmon*, 343 Md. 390, 397 (1986) (cleaned up). This Court determines what constitutes the "practice of law."[11] To determine what is the

---

[10] We determine that it is particularly appropriate to compartmentalize Bar Counsel's exceptions in this manner given the unique and significant mitigating factors in this case (including the fact that, for *years*, the Office of Bar Counsel was not only aware of Ms. Jackson's Maryland office, but had made *specific recommendations for how to maintain it*), as well as the fact that under our current rules and case law, there *are* exceptions where an attorney who is not admitted in Maryland, may nonetheless maintain an office for the practice of law and not run afoul of the prohibition in Rule 5.5(b)(2) against holding oneself out as a Maryland lawyer.

[11] BOP § 10-101(h)(1) also identifies certain conduct as constituting the "practice [of] law." Specifically, the statute defines the phrase "Practice law" as "engag[ing] in any of the following activities: (i) giving legal advice; (ii) representing another person before a

practice of law, we look at the facts of each case and determine whether they "fall within

the fair intendment of the term." *Id.* (cleaned up). As we recently stated in *Attorney*

*Grievance Commission v. Maldonado*,

> [t]o determine whether an individual has engaged in the practice of law, the focus of the inquiry should be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent. The unauthorized practice of law includes utilizing legal education, training, and experience to apply the special analysis of the profession to a client's problem. Where trial work is not involved but the preparation of legal documents, their interpretation, the giving of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law.

463 Md. 11, 43 (2019) (internal quotations and citations omitted).

Based upon our review of this record, we determine that Bar Counsel has failed to

prove by clear and convincing evidence that Ms. Jackson engaged in the unauthorized

---

unit of the State government or of a political subdivision; or (iii) *performing any other service that the Court of Appeals defines as practicing law*." (Emphasis added). In other words, although the statute provides some basic definitions as far as what constitutes the practice of law, it recognizes that for any other conduct, it is this Court's role to define it. We have described the role of the Legislature and the Court of Appeals in connection with defining the practice of law as follows:

> Under our constitutional system of separation of powers, the determination of what constitutes the practice of law and the regulation of the practice and of its practitioners is, and essentially and appropriately should be a function of the judicial branch of the government. In many States it has been held that the legislative branch cannot constitutionally exercise that judicial function although it may make implementing regulations. In Maryland there has always been a comfortable accommodation in this area . . . . The legislature has forbidden the practice of law by one not a lawyer . . . but it consistently has recognized that the courts can and should decide in any instance presented what does and does not constitute the practice of law.

*Public Service Comm'n v. Hahn Transp., Inc.*, 253 Md. 571, 583 (1969) (internal citations omitted).

practice of law through her performance of administrative functions related to the operation of the law firm. Ms. Jackson was in charge of hiring attorneys, determining their salary, and approving leave. As part of her administrative functions, she established the hourly rates for associate-attorneys employed by the firm. She tracked expenses incurred by the firm and provided the information to the Maryland attorneys so that they could assist their clients in understanding their potential recovery. Ms. Jackson testified that she "did not have any involvement in handling Maryland cases," but that through the performance of the firm's administrative duties, she managed the disbursement process and assisted her colleagues with calculating the clients' net recovery after deducting contingency fees, liens, and case expenses.

Bar Counsel argues that Ms. Jackson's preparation of settlement sheets for clients of the firm constituted the practice of law. Stripped of its label, a "settlement sheet" typically consists of a document prepared using basic bookkeeping functions—deducting expenses and fees from a gross recovery number.[12] None of these administrative or

---

[12] In support of its argument that Ms. Jackson's preparation of settlement sheets constitutes the practice of law, Bar Counsel attempts to equate the act of preparing a *settlement sheet* with the act of *settling cases* or preparing *settlement agreements*. We have previously determined that the act of "[s]ettling cases is the practice of law." *See*, *e.g., Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 251 (2018). When an attorney engages in settlement discussions with another party or his or her client, such conduct necessarily involves analyzing legal issues, including assessing the strengths and weaknesses of a client's particular position, and providing advice to the client concerning settlement options. Here, there is no evidence that Ms. Jackson settled cases, or provided any legal advice to any clients of the law firm on any case or matter arising in Maryland. We determine that, based upon the facts proven by Bar Counsel here (or a lack thereof), Ms. Jackson's administrative or bookkeeping function in preparing settlement sheets for clients of the firm, without more, did not constitute the practice of law.

bookkeeping functions require applying legal knowledge or skill, providing legal advice, or applying legal principles to problems of any complexity. Indeed, these functions are routinely performed by non-lawyers in office management positions. We determine that the cases relied upon by Bar Counsel to argue that a Rule 5.5(a) violation arising from Ms. Jackson's performance of these administrative functions are inapposite and factually distinguishable. *See Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 116–17 (2015) (concluding that the attorney violated Rule 5.3(a), (b), and (c) by failing to supervise a non-lawyer who met with clients, quoted fees, provided legal advice, and held himself out as an attorney); *Attorney Grievance Comm'n v. Zhang*, 440 Md. 128, 167 (2014) (concluding that a Maryland attorney violated Rule 5.5(a) by representing a client in a divorce proceeding in Virginia by drafting and preparing pleadings to be filed, participating in settlement negotiations, and preparing for hearings).

With respect to Bar Counsel's exception to the hearing judge's failure to find a violation of Rule 5.5(a) arising from Ms. Jackson's attendance at Maryland settlement conferences and mediations that were also attended by Maryland attorneys who were representing their clients, we similarly overrule this exception. In response to Ms. Jackson's request for admissions, Bar Counsel admitted that it "had no evidence that [Ms. Jackson] attended proceedings as counsel before any Maryland Court." Although Ms. Jackson attended some private mediations in Maryland cases, she attended them in the presence of Maryland lawyers, Victoria Adegoke and Tiffany Sims, both of whom testified that Ms. Jackson never held herself out as counsel to any party, and she was always accompanied by a licensed Maryland attorney who was handling the case. In other

26

instances, the undisputed evidence reflected that Ms. Jackson attended settlement conferences with her mentor, Stan Brown, a Maryland attorney who represented crime victims, to shadow or learn from Mr. Brown within the legal practice area of negligent security claims. We overrule Bar Counsel's exception that the hearing judge should have found additional Rule 5.5(a) violations based upon this record.[13]

2. <u>Bar Counsel's Exceptions Relating to Rule 5.5(b)(2) Charges that Ms. Jackson "Held Herself Out to the Public" as a Maryland Lawyer</u>

Bar Counsel excepts to the hearing judge's failure to conclude that Ms. Jackson violated Rule 5.5(a) and (b) by "holding herself out as a Maryland attorney." Bar Counsel

---

[13] In addition to the performance of administrative functions, Bar Counsel relies on *Attorney Grievance Commission v. Harper and Kemp,* 356 Md. 53 (1999) ("*Harper*"), for the proposition that "[t]his Court's jurisprudence supports the conclusion that Ms. Jackson's operation of the law firm from the Maryland office constitutes the unauthorized practice of law under Rule 5.5(a)." In *Harper*, we found that a Maryland attorney assisted a non-Maryland attorney in the unauthorized practice of law in violation of Rule 5.5(a). In that case, Bar Counsel asserted a "legal theory" of the unauthorized practice of law—"that the lawyer who is admitted in another jurisdiction, but who is not admitted in Maryland, may not practice law in Maryland in partnership with a Maryland attorney, out of an office maintained by the partnership in Maryland, unless the Maryland attorney supervises the work of the unadmitted lawyer." *Id.* at 61–62. We pointed out, *however that both respondent attorneys accepted Bar Counsel's legal analysis, and as such, we had "no occasion in this matter to explore the theory further.*" *Id.* at 62 (emphasis added). In addition to failing to challenge Bar Counsel's legal premise, the non-admitted attorney, Mr. Harper, did not file any exceptions on the "principal issue" involving the unauthorized practice of law, and he limited his exceptions to challenging the sufficiency of the evidence to support two of the client-specific charges. *Id.* At oral argument, Mr. Harper only addressed the more global charge involving the unauthorized practice of law by making a factual argument that he was, in fact, supervised by the Maryland barred attorney, Mr. Kemp. *Id.* On the facts of that case, we rejected Mr. Harper's factual argument. Given the respondents' acceptance of Bar Counsel's theory in that case, and their failure to file exceptions to the legal conclusions of a Rule 5.5(a) violation on that point, we are not persuaded that *Harper* dictates a finding of a Rule 5.5(a) violation under the unique facts of this case.

asserts that "the undisputed facts establish[] that, between 2014 and 2020, [Ms. Jackson] violated Rule 5.5(a) and (b) when she . . . held herself out to the public as being admitted to practice law in Maryland." Bar Counsel bases its assertion on the following facts: (1) from 2014 to 2015, Ms. Jackson's letterhead, business cards, email signature, and website did not disclose or identify her jurisdictional limitation; (2) from 2014 until the present, the law firm office signage (specifically, the sign in the lobby of the office building, the office suite door, and a sign inside the office) has not identified Ms. Jackson's jurisdictional limitation; and (3) in 2020, the law firm's website included a link to an Avvo.com profile that failed to state her jurisdictional limitations yet offered personal injury services.[14]

We shall sustain Bar Counsel's exception to the hearing judge's failure to find that Ms. Jackson violated Rule 5.5(b)(2) in the 2014–2015 time period (prior to her meeting with Senior Assistant Bar Counsel) during which time she had not placed jurisdictional limitations on her letterhead, business card, email signature, and website. Based on this record, we overrule Bar Counsel's exception to the hearing judge's failure to find Rule 5.5(a) and (b) violations because the law firm's office signage did not contain Ms.

_____

[14] In addition to these facts, Bar Counsel identifies additional undisputed facts related to Ms. Jackson's *physical presence* in Maryland which Bar Counsel contends support a violation of Rule 5.5(b)(2). These facts are that: (1) between 2014 and 2019, Ms. Jackson was the sole owner of Jackson & Associates; (2) between 2014 until 2020, Jackson & Associates' only office location was in Maryland; and (3) Ms. Jackson physically practiced law from her office and routinely met with clients. As we discuss in this opinion, although Ms. Jackson's conduct in establishing an office in Maryland and practicing law from that location violated Rule 5.5(b)(1), we do not conclude, based upon this record, that Ms. Jackson, through her physical presence alone, "held herself out to the public or otherwise represent[ed]" that she is a Maryland lawyer. We overrule Bar Counsel's exception to a finding of a Rule 5.5(b)(2) violation based upon her presence alone.

Jackson's jurisdictional limitation, and the firm's website only contained Ms. Jackson's jurisdictional limitation under the attorney's profiles and not elsewhere on the website prior to the website being updated in 2019. As the hearing judge observed, the law firm employs three lawyers barred in Maryland. A client or prospective client who visits the office may meet with a Maryland lawyer to discuss Maryland legal matters. Given the facts and circumstances of this case—including that Ms. Jackson implemented the jurisdictional limitations suggested by Senior Assistant Bar Counsel in 2015, that the firm employs Maryland attorneys, and that the hearing judge found that Bar Counsel failed to establish any evidence that Ms. Jackson has engaged in the unauthorized practice of law, or has otherwise held herself out to the public as a Maryland lawyer despite her physical presence here for the past six years—we agree with the hearing judge's conclusion that Bar Counsel failed to prove that the law firm signage or website established a violation of Rule 5.5(a) or (b).

Nor will we find a violation of Rule 5.5(a) or (b) based upon the fact that a third-party website, Avvo.com, did not specify Ms. Jackson's jurisdictional limitation. Again, Ms. Jackson made the changes suggested by Senior Assistant Bar Counsel to reflect her jurisdictional limitations. The hearing judge found that Ms. Jackson did not create the Avvo.com profile and did not review the profile to make sure it noted that she was only barred in the District of Columbia. After this matter was brought to Ms. Jackson's attention in the context of this disciplinary proceeding, the Avvo.com profile was changed and currently lists Ms. Jackson's jurisdictional limitation.

3.  Bar Counsel's Exceptions Relating to Rule 5.5(b)(1) Charges
    Related to Ms. Jackson's Physical Presence in Maryland

This takes us to Bar Counsel's final exceptions bucket related to Rule 5.5—its assertion that the hearing judge erred in failing to find that Ms. Jackson's conduct in establishing an office in Maryland violated Rule 5.5(b)(1). As we previously noted, this subparagraph states the general rule that, unless "authorized by these Rules or other law," an attorney who is not admitted in Maryland shall not "establish an office or other systematic and continuous presence" in Maryland for the practice of law. The rule, as currently written, prohibits an attorney who is not admitted in Maryland from maintaining an office in the State or maintaining some other "continuous and systematic presence," unless one of the enumerated exceptions applies.

Ms. Jackson argues that her practice falls within the federal practice exception set forth in Rule 5.5(d)(2). Ms. Jackson points out that attorneys who limit their practice to matters arising under federal laws in federal courts or federal agencies routinely practice from offices in Maryland without admission into the Maryland Bar. *Cf. Attorney Grievance Comm'n v. Tatung*, 476 Md. 45 (2021). Ms. Jackson contends that, by limiting her practice to cases and matters arising in the District of Columbia or other federal courts, she falls within the federal practice exception. Like bankruptcy and federal tax courts, she points out that District of Columbia courts were authorized by Congress under Article I of the United States Constitution, are funded entirely by the federal government, and are staffed with judges appointed by the President of the United States.

We disagree with Ms. Jackson's interpretation of the federal practice exception and decline to hold that it applies to all non-Maryland barred attorneys who are licensed in the District of Columbia, as we determine that such an interpretation would expand the exception beyond its plain language, as well as its purpose and intent.

The federal practice exception, Rule 5.5(d)(2), provides that "[a]n attorney admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, *may provide legal services in this jurisdiction* that . . . are services that the attorney is *authorized to provide by federal law* or other law of this jurisdiction." (Emphasis added). Paragraph (d)(2) permits an attorney to provide legal services in a jurisdiction in which the attorney is admitted, if authorized by federal or other law, court rules, executive regulations, or jurisdictional precedents. *See* Md. Rule 5.5, cmts. [15] and [18]. Under the plain language of the statute, if a federal court or federal agency authorizes an individual to appear in its court or in an administrative proceeding *in Maryland* without being licensed in Maryland, our professional rules permit such conduct.

The language in our Rule 5.5, as well as the comments thereto, are substantially similar to the language of the Ethics 2000 Amendments to the ABA Model Rules. The federal practice exception was adopted in response to a 1963 Supreme Court decision, *Sperry v. Florida*, 373 U.S. 379 (1963). In that case, Mr. Sperry, a non-attorney, practiced patent law in Tampa, Florida without admission to the Florida Bar or any other state bar. Mr. Sperry, however, was licensed to practice before the U.S. Patent and Trademark Office ("USPTO"). *Id.* at 381. The Florida Bar brought suit to enjoin Mr. Sperry's conduct on the ground that it constituted the unauthorized practice of law. *Id.* at 383.

31

Although the Court did not question the determination that, under Florida law, preparing and prosecuting patent applications for others constituted practicing law, and that Florida had a substantial interest in regulating the practice of law within the State, it could not validly prohibit this "practice" because Congress had given the Commission of Patents the authority to promulgate "regulations governing the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Patent Office." *Id.* at 384. Accordingly, the Court concluded that state law must "yield" when it is incompatible with federal law. *Id.* at 383–84.

Based upon the *Sperry* decision, the federal practice exception (sometimes referred to as the "federal overlay" exception) was developed in recognition that, for those who limit their practice to federal law, federal law may preempt a state's power to regulate the practice within its geographic borders. *See also Surrick v. Killion*, 449 F.3d 520 (3d Cir. 2006) (holding that the suspension of an attorney by a state supreme court cannot override the federal district court's power to authorize an attorney to maintain a law office in the state dedicated exclusively to his practice in federal court); *Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334 (Fed. Cir. 2005) (holding that federal law, not state law, controls whether an attorney who is not licensed in a state may represent the claimant and recover statutory fees in a federal administrative proceeding); *In re Desilets*, 291 F.3d 925 (6th Cir. 2002) (Texas attorney who was not admitted in Michigan, and who had an office in Michigan was permitted to practice in the federal bankruptcy court in Michigan because he was admitted to practice before the federal bankruptcy court in that state).

The District of Columbia courts are courts of general jurisdiction that are physically located within the geographic boundaries of the District. The preemption concerns that precipitated the enactment of the federal practice or federal overlay exception in Rule 5.5(d)(2) (as articulated by the Supreme Court in *Sperry*) are not present when an individual is licensed to practice law in the District of Columbia and practices in the courts located there. Unlike the United States District Court for the District of Maryland, the United States Bankruptcy Court for the District of Maryland, or a federal administrative agency located in Maryland, the courts established in the District of Columbia are not located within our geographic borders, and therefore do not trigger any federal overlay concerns. We decline to interpret the federal practice exception in a manner that is inconsistent with its plain language,[15] or its purpose or intent.

Because we have determined that Ms. Jackson's physical presence in Maryland did not fall within the federal practice exception (or any other exception), we are constrained to give effect to the plain language of Rule 5.5(b)(1) as presently adopted, and to sustain Bar Counsel's exception that Ms. Jackson's conduct in maintaining an office in our State was in violation of that rule.

Although we are constrained to apply the plain language of the Rule, the facts of this case (and changes to the modern practice of law) have caused us to reflect on its continued wisdom. Specifically, we question whether a rigid prohibition based *solely*

---

[15] Under a plain language analysis of the exception, of course, there is no "federal law" that authorizes an individual who is licensed by the District of Columbia Bar to practice in its courts of general jurisdiction to also practice law in Maryland. *See* Md. Rule 5.5(d)(2).

upon geographic considerations of physical presence remains an appropriate litmus test for determining whether an individual is engaged in the unauthorized practice of law in our State. As discussed below, we observe that some states have departed from this formalistic approach.

### *Rule 5.5 – The Modern Treatment of "Physical Presence" Adopted by Some of Our Sister Supreme Courts*

As previously noted, Maryland Rule 5.5 is substantially similar to the language of the Ethics 2000 Amendments to the ABA Model Rules of Professional Conduct. The annotations to ABA Model Rule 5.5 point out that, "[a]lthough not reflected in the Model Rules, a potentially growing state trend is to permit out-of-state lawyers to maintain an office in-state so long as they do not practice the host state's law." Ann. Mod. Rules Prof. Cond. § 5.5 (9th Ed. 2019).

We observe that Arizona Rule of Professional Conduct 5.5(d) provides that:

> A lawyer admitted in another United States jurisdiction, or a lawyer admitted in a jurisdiction outside the United States, not disbarred or suspended from practice in any jurisdiction, *may provide legal services in Arizona that exclusively involve* by federal law, *the law of another jurisdiction,* or tribunal law.

(Emphasis added). The phrase "law of another jurisdiction" contained in the Arizona Rule expressly permits a lawyer who is not licensed in Arizona, but is licensed in another state, to practice the law of the state where he or she is licensed, within the geographic boundaries of the State of Arizona.

In New Hampshire, in addition to the in-house counsel exception and the federal practice exception included in the ABA Model Rule, the New Hampshire Rule of

Professional Conduct 5.5(d)(3) contains an additional exception, which permits an attorney who is barred in a jurisdiction other than New Hampshire to maintain an office or other continuous and systematic presence in the state to provide legal services that "relate solely to the law of a jurisdiction in which the lawyer is admitted." Notably, Comment [3] to the New Hampshire Rule 5.5 notes in part that:

> Prior versions of Rule 5.5 and our prior interpretations of the Rule assumed that attorneys practiced in fixed physical offices and only deal with legal issues related to the States in which their offices are located. The increased mobility of attorneys, and, in particular, the ability of attorneys to continue to communicate with and represent their clients from anywhere in the world, are circumstances that were never contemplated by the Rule.
>
> * * * *
>
> The assumption that a lawyer must be licensed in New Hampshire simply because he or she happens to be present in New Hampshire no longer makes sense in all instances. *Rather than focusing on where a lawyer is physically located, New Hampshire's modifications* to Rule 5.5(b)(1) and (2) and adoption of new Rule 5.5(d)(3) *clarify that a lawyer who is licensed in another jurisdiction but does not practice New Hampshire law need not obtain a New Hampshire license to practice law solely because the lawyer is present in New Hampshire.*

(Emphasis added).

In Virginia, Comment 4 to Virginia Rule 5.5 states that "[d]espite the foregoing general prohibition [on the unauthorized practice of law], a Foreign Lawyer[16] may establish an office or other systematic and continuous presence in Virginia if the Foreign Lawyer's

---

[16] The Virginia Rule of Professional Conduct Rule 5.5(d)(1) defines "Foreign Lawyer" as "a person authorized to practice law by the duly constituted and authorized governmental body of any State or Territory of the United States or the District of Columbia, or a foreign nation, but is neither licensed by the Supreme Court of Virginia or authorized under its rules to practice law generally in the Commonwealth of Virginia, nor disbarred or suspended from practice in any jurisdiction."

practice is limited to areas which by state or federal law do not require admission to the Virginia State Bar." The Virginia Supreme Court has approved a Virginia Ethics Opinion concluding that,

> foreign lawyers who are licensed to practice in other U.S. jurisdictions and based in [a] multi-jurisdictional law firm in Virginia would not be engaging in the unauthorized practice of law in violation of Rule 5.5 so long as they limit[] their practice to the law of the jurisdiction/s where they are licensed, to federal law not involving Virginia law, or to temporary or occasional practice as authorized by [certain subsections of Virginia Rule 5.5(d)].

Va. Ethics Op. 1856 (2011; Supreme Court approval 2016).

Like our colleagues on the New Hampshire Supreme Court, we question whether the "physical presence" limitations set forth in Rule 5.5(b)(1) continue to strike the appropriate balance between protecting the public and our profession on the one hand and recognizing the realities of the modern practice of law on the other.[17] As we recently

---

[17] The purpose of the attorney professional conduct rules prohibiting the unauthorized practice of law is "to protect the public from being preyed upon by those not competent to practice law—from incompetent, unethical, or irresponsible representation." *Attorney Grievance Comm'n v. Brisbon*, 422 Md. 625, 641 (2011) (internal citations omitted). Even if this Court were to expand the exceptions by which an attorney who is not licensed in Maryland may maintain an office or physical presence in this State, of course, the attorney would not be permitted to practice Maryland law. For example, we have disciplined attorneys who exceed the boundaries of the federal practice exception by also engaging in the practice of Maryland law. *See*, *e.g.*, *Attorney Grievance Comm'n v. Ambe*, 425 Md. 98 (2012) (reprimanding an attorney after upholding a violation of Rule 5.5(a) where an immigration attorney who maintained an office in Maryland engaged not only in federal immigration law, but also practiced Maryland tort law, and upholding a violation of Rule 5.5(b) by failing to clearly indicate on his business cards that he was not licensed to practice law in Maryland). The requirements of Rule 5.5(a) and (b)(2) require that an attorney who is not licensed in Maryland exercise caution regarding public information concerning his or her practice. For example, the attorney must indicate the limitations of his or her practice on letterhead, business cards, website, etc. *See* Md. Rules 7.1 and 7.5.

observed in *Tatung*, with the modern digital and electronic advances that have enhanced professional portability, "it is increasingly possible for an attorney to practice law from a location other than the jurisdiction in which he or she is licensed." 476 Md. at 50. Indeed, the events associated with the COVID-19 pandemic have highlighted the benefits of professional portability.[18] Our current Rule 5.5 does not reflect the reality of a modern, portable profession. Additionally, in the context of a multi-jurisdictional practice, this case highlights the challenges posed by a professional rule that equates the "unauthorized practice of law" solely with physical presence. As written, the rule may create complications for multi-jurisdictional law firms maintaining an office in Maryland where some lawyers employed by the law firm are not licensed in Maryland but are licensed to practice in another jurisdiction.[19] For the reasons expressed by the Supreme Court of New Hampshire, discussed *supra*, we shall refer this Rule to the Standing Committee on Rules of Practice and Procedure for consideration and recommendation, as a matter of general policy, regarding whether an amendment to Rule 5.5(b)(1) may be warranted.

---

[18] For example, an attorney who is licensed only in the District of Columbia but resides in Maryland may have practiced law from his or her home during the pandemic. We question whether the "unauthorized practice of law" should be triggered based solely upon a "continuous and systematic presence" if the attorney's practice is limited to the laws of the jurisdiction in which he or she is licensed, and there is no evidence that the attorney is holding himself or herself out as a Maryland attorney.

[19] Counsel for Ms. Jackson asserts that a formalistic rule based solely on geography or physical presence might be selectively and unfairly enforced against a smaller multi-jurisdictional law firm such as Jackson & Associates (with four attorneys, one of whom is barred in the District of Columbia and three others licensed in Maryland) and not enforced against a midsize or large multi-jurisdictional firm located in Maryland that may employ attorneys who work in that office but are licensed in another state in a similar manner.

***Bar Counsel's Exceptions to Hearing Judge's Failure to Find a Violation of Rule 8.4 and Section 10-601 of the Business and Occupations Professions Article***

Finally, Bar Counsel has filed exceptions to the hearing judge's failure to conclude that Ms. Jackson's physical presence in Maryland resulted in a violation of Rule 8.4(a), (b), (d),[20] and section 10-601 of the Business and Occupations Professions Article. Bar Counsel asserts that these rules were violated when Ms. Jackson "established an office in Maryland for the practice of law and held out to the public that she was authorized to practice law in Maryland[.]" According to Bar Counsel, Ms. Jackson violated "8.4(b) by committing a criminal act that reflects adversely on her honesty, trustworthiness, or fitness as a lawyer[]" and points out that BOP § 10-601 "criminalizes the unauthorized practice of law."

Based upon the unique facts of this case, we overrule Bar Counsel's exceptions. We cannot ignore the fact that any violation of Rule 5.5(a) or (b) arising from Ms. Jackson's continuous and systematic presence in this State since 2015 was undertaken with

---

[20] Rule 8.4 provides, in part:

It is professional misconduct for an attorney to:

(a)    violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b)    commit a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as an attorney in other respects;

\* \* \*

(d)    engage in conduct that is prejudicial to the administration of justice[.]

38

knowledge by the Office of Bar Counsel, and its express recommendations concerning how to maintain her office in a manner that purported to comply with the professional rules. To be sure, Ms. Jackson initially relocated to Maryland and failed to state her jurisdictional limitations on her business cards, email signature, and website. However, the hearing judge determined that she implemented the recommendations made by Senior Assistant Bar Counsel. Additionally, by visiting with Ms. Jackson at her office, suggesting safeguards to comply with the professional rules, and then failing to follow up with Ms. Jackson in any manner for three and one-half years, a reasonable person in Ms. Jackson's position would have taken those suggestions as either explicit or tacit approval that her conduct in maintaining an office in Maryland complied with the professional rules. Ms. Jackson has, in good faith, attempted to comply with the jurisdictional parameters recommended by the Office of Bar Counsel. We overrule Bar Counsel's exceptions to the hearing judge's failure to find a violation of Rule 8.4(a), (b), and (d) or violations of BOP § 10-601.

## III

### Sanction

Turning to any potential sanction that we may impose in this case, Bar Counsel initially recommended that we disbar Ms. Jackson in the event we "wholly or substantially sustain[ed] Petitioner's exceptions." At the oral argument in this matter, Bar Counsel changed the recommended sanction from disbarment to indefinite suspension, again assuming that we sustained Petitioner's exceptions. In the event we overruled Bar Counsel's exceptions (which we have, for the most part), Bar Counsel recommended that we impose a 60-day suspension on Ms. Jackson. Ms. Jackson recommended that we

39

dismiss the charges or impose no sanction.  Under the unique facts presented in this case, we agree with Ms. Jackson that no sanction is appropriate in this case.

The purpose of a sanction in an attorney discipline case is "not so much to punish the attorney as to protect the public and the public's confidence in the legal profession." *Attorney Grievance Comm'n v. Singh*, 464 Md. 645, 677 (2019) (internal quotations omitted).  The sanction should be "commensurate with the nature and gravity of the violations and the intent with which they were committed."  *Attorney Grievance Comm'n v. Stein*, 373 Md. 531, 537 (2003).  "We evaluate each attorney grievance matter on its own merits, taking into consideration the particular facts and circumstances when fashioning the appropriate sanction."  *Attorney Grievance Comm'n v. Ibebuchi*, 471 Md. 286, 308–09 (2020).  When considering the sanction to be imposed in a particular case, we typically consult the list of aggravating and mitigating factors developed by the American Bar Association.  *Attorney Grievance Comm'n v. Blatt*, 463 Md. 679, 707 n.19 (2019) (listing aggravating and mitigating factors).  We consider any aggravating or mitigating factors that are peculiar to the respondent attorney or the facts of the particular case.  In the end, we do not apply these factors mechanically or as a rote formula.  Rather, we tailor the sanction to the facts and circumstances of the particular case.

### *Aggravating Factors*

With respect to aggravating factors, the hearing judge found none.  Bar Counsel contends that it proved by clear and convincing evidence the presence of three aggravating factors, specifically that Ms. Jackson: (1) has substantial experience in the practice of law; (2) committed multiple offenses; and (3) engaged in a pattern of misconduct.  We sustain

Bar Counsel's exception concerning the presence of one aggravating factor—that Ms. Jackson has substantial experience in the practice of the law. We overrule Bar Counsel's exceptions as far as the hearing judge's failure to find the presence of the latter two aggravating factors. We agree with the hearing judge that Bar Counsel failed to prove that Ms. Jackson committed multiple offenses or engaged in a pattern of misconduct.

***Mitigating Factors***

The hearing judge found the presence of nine mitigating factors: (1) absence of prior disciplinary record, (2) absence of a dishonest or selfish motive; (3) presence of personal or emotional problems; (4) good faith efforts to rectify concerns; (5) delay in disciplinary proceedings; (6) full and free disclosure to the disciplinary board; (7) a cooperative attitude toward proceedings; (8) a fine character and reputation; and (9) unlikelihood of misconduct in the future. Neither party filed exceptions to the hearing judge's findings concerning the presence of the substantial mitigating factors in this case. Given that the mitigating factors present here tip the scales in favor imposing no sanction under the unique facts of this case, it is useful to discuss them, as well as the hearing judge's findings of fact that support each factor.

1.     Absence of a Prior Disciplinary Record

The hearing judge noted that Ms. Jackson has no history of discipline, pointing out that the "only time she has been involved in prior disciplinary proceedings" involved her "cooperation as a witness" in the matters involving her ex-partner.

## 2.   Absence of a Dishonest or Selfish Motive

The hearing judge determined that Ms. Jackson had no dishonest or selfish motive in connection with any violation of professional rules.

## 3.   Personal or Emotional Problems

The hearing judge found that the scandal involving her ex-partner, Ms. Baylor, created a "professional and emotional upheaval" that "flowed into her personal life [and] had dire consequences to her income." The hearing judge also found that, from the moment that the SEC called Ms. Jackson "to break the news [that her partner was being investigated for civil fraud involving her law firm] and for more than a year thereafter, her life 'was a blur.'" The hearing judge credited Ms. Jackson's testimony that she was "emotionally . . . distraught, because everything that I worked for, I just got a call that it was over." Ms. Jackson testified that, with her accounts frozen, "there was no way to take care of my family or the staff." Ms. Jackson described herself as "a zombie trying to keep everything together." The hearing judge summarized Ms. Jackson's personal and emotional state during the time period beginning with the SEC's telephone call as being "overwhelmed with obligations to her family, her staff, the SEC, the disciplinary authorities investigating [Ms.] Baylor in [the District of Columbia] and in Maryland and [] embroiled in civil litigation herself as a 'relief defendant.'" In finding that Ms. Jackson suffered from personal or emotional problems during "a large chaotic period[,]" the hearing judge relied upon Ms. Jackson's medical records that were admitted into evidence, and credited her testimony summarizing her emotional state at that time:

[T]here were certain days where I couldn't get out of bed . . . where I was so sick and I started to suffer from panic attacks to the point that I couldn't drive . . . . There were days where I couldn't even pick up my kids because I felt so overwhelmed . . . with trying to sustain a firm, trying to stay barred, trying to work with the Department of Justice, trying to work with Bar Counsel, trying to find a way to pay the staff.

* * * *

I had gone to the hospital for panic attacks, I was on medicine. I was winding down with the SEC all of the financials for Baylor [&] Jackson. I was doing depositions with the Department of Justice for [the investigation involving] my partner. I was dealing with D.C. Bar Counsel and getting out letters and trying to figure out what clients would stay and what I needed to do as far as reassign refunds and things of that nature.

Based upon this evidence, the hearing judge found that Ms. Jackson continued "to maintain her old firm while forming another and meeting everyone else's demands," "'was not available for [her own] cases,' missed significant office time, and grew increasingly reliant on her staff." Based upon these facts, the hearing judge concluded that Ms. Jackson's personal and emotional state should be considered as a mitigating factor, particularly given that he only found one violation of a professional rule—signing two lines to reissue a summons.

### 4. Timely Good Faith Efforts to Rectify Misconduct

The hearing judge found that "[l]ong before these proceedings began, [Ms. Jackson] exercised good faith in resolving any issues [that were] brought to her attention." The hearing judge determined that, "[a]t a bare minimum," Ms. Jackson attempted to address any "possible concerns" that the Office of Bar Counsel had with her Maryland office, by making the suggested changes to her letterhead, website, business cards, etc. "even if it was later than [Bar Counsel] believes it should have occurred."

43

5.      Delve in Disciplinary Proceedings

        5.      Delay in Disciplinary Proceedings

The hearing judge made considerable findings with respect to this mitigating factor under the unique facts of this case. Specifically, the hearing judge noted that Bar Counsel learned of Ms. Jackson's "continuous and systematic presence in Maryland at least six years ago when [Ms. Ridgell] met with her in early 2015 and personally visited [her Maryland office] shortly thereafter." The hearing judge found that, "[r]ather than instruct[ing] her to close the office, or launch a formal investigation into its propriety, Dolores Ridgell *made recommendations for maintaining it*." (Emphasis added). The hearing judge commented on the prejudicial effect that Bar Counsel's "extraordinary delay" had on Ms. Jackson's ability to defend the charges that were ultimately filed against her:

> Regardless of Bar Counsel's reasons for this delay, its consequences are particularly evident from the record in this case. Given the passage of time, most witnesses do not remember details of the allegations contained in the Petition. Lack of specificity from witnesses due to length of time would relieve [Bar Counsel] of its burden. This also places [Ms. Jackson] in the awkward position of trying to defend her actions when, in fact, she cannot recall them either. *Even if the prejudice resulting from this extraordinary delay is not a dispositive factor in this case, it should certainly be considered as a mitigating factor in the ultimate outcome*.

(Emphasis added). We agree with the hearing judge's characterization of the delay presented in this case. Not only was Ms. Jackson prejudiced in having to explain her signature on two lines many years after they were filed, but she was also prejudiced by Bar Counsel's actions in giving her recommendations on how to maintain an office in Maryland and then waiting three and one-half years to raise its concerns.

44

### 6. Full and Free Disclosure to Disciplinary Board

In response to Bar Counsel's attempt to "use [Ms. Jackson's] unrecorded interview responses against her," the hearing judge found "no merit in [Bar Counsel's] claims that she gave any false statement [to Bar Counsel] whatsoever."[21] The hearing judge determined that Ms. Jackson "has, at all relevant times, been open and honest throughout Bar Counsel's investigation and all related proceedings." The hearing judge noted that, [i]f anything, [Ms. Jackson] has shown a long history of close cooperation with the Office of Bar Counsel."

### 7. Cooperative Attitude Toward Proceedings

Along the same vein as mitigating factor 6 above, the hearing judge found that Ms. Jackson "fully cooperated with the Office of Bar Counsel in the course of its investigation and in these proceedings."

### 8. Character and Reputation

In the mitigation phase of the hearing, Ms. Jackson called two witnesses to testify as to her character, Judge Dolores Dorsanvil, and Bridgett Stumpf, who is the Executive Director of the Network for Victim Recovery of DC ("NVRDC").[22] The hearing judge

---

[21] The hearing judge's reference to Ms. Jackson's unrecorded statement relates to Bar Counsel's attempt to prove that Ms. Jackson "made a false statement of material fact" to Bar Counsel in connection with its investigation in violation of Rule 8.1(a). Bar Counsel alleged that Ms. Jackson misrepresented her involvement in the Yenchochic case, as well as the Lyons case. The hearing judge disagreed, finding that Ms. Jackson was not involved in either case, and also finding no Rule 8.1(a) violation in connection with Ms. Jackson's responses to Bar Counsel on these matters. The hearing judge observed that "there is a large difference between disagreeing with a response and finding said response is knowingly false."

[22] Although Ms. Jackson offered to call two additional character witnesses, the hearing judge was satisfied with the testimony provided by Judge Dorsanvil and Ms. Stumpf.

45

found that both witnesses hold Ms. Jackson in very high esteem and that she has earned their respect as a strong advocate for crime victims who may not otherwise have access to justice in the District of Columbia. Ms. Stumpf testified that Ms. Jackson has been honored by the NVRDC for her dedication to survivors of sexual assault and other crimes, providing pro bono legal services to crime victims through her participation in that organization. Ms. Stumpf testified that, on an annual basis for over eight years, she has referred Ms. Jackson more than a dozen cases, with the knowledge that Ms. Jackson will handle these clients with care. Ms. Stumpf testified that "it takes a special committed dedicated selfless person to do this type of civil work particularly for these clients that are so vulnerable." In Ms. Stumpf's opinion, "she is an incredible human." Ms. Stumpf testified that "Dawn is few and far between" among "those of us in this work that are dedicating our careers to making other people's lives better."

Judge Dorsanvil also testified that Ms. Jackson is "a very good person. She is very honest. She is very trustworthy." As a former Assistant Bar Counsel in the State of Maryland and Assistant Disciplinary Counsel for the District of Columbia, Judge Dorsanvil "wouldn't feel comfortable calling her a friend if [she] didn't think that she had certainly good moral character." A "voice for people who ordinarily . . . would probably never get their day in court," Ms. Jackson "prides herself on handling cases that . . . many firms would more than likely turn away" and is "very passionate" about her role in the lives of D.C. crime victims. The hearing judge characterized Judge Dorsanvil's testimony as follows:

[When a]sked whether the allegations of the Petition have diminished her respect for [Ms. Jackson], this former ethics lawyer testified otherwise. Indeed, when [Ms. Jackson] told her 'some years ago' that she was 'being investigated for engaging in unauthorized practice of law,' Judge Dorsanvil knew better. 'I have never known her to hold herself out as a Maryland lawyer. She has always been a D.C. lawyer.'

The hearing judge commented that both witnesses testified to Ms. Jackson's character as being "beyond reproach," and found "more than a preponderance of evidence on this mitigating factor."

### 9.     Unlikelihood of Repetition of Any Misconduct

Noting that Ms. Jackson has also opened an office in the District of Columbia, the hearing judge stated that "it would certainly appear that any lingering concerns with [Ms. Jackson's] practice have been fully addressed." The hearing judge further stated that, although "[t]his court is not convinced that [Ms. Jackson] engaged in the unauthorized practice of law, [Bar Counsel] has not voiced any concern with maintaining a law firm with more than one location. So long as she does so, this [c]ourt would not expect any further complaint from Petitioner or from Bar Counsel."

As previously noted, Bar Counsel did not file any exceptions to the presence of these mitigating factors. We agree with the hearing judge's determination that Ms. Jackson has proven the existence of significant mitigating factors in this case.

With these mitigating factors in mind, we turn to the appropriate sanction. In cases involving the unauthorized practice of law, we "primarily consider factors of deterrence, whether respondent's conduct was willful and deliberate, and whether respondent

47

cooperated with Bar Counsel's investigation." *Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 77 (2018) (cleaned up).

In the event that we overruled Bar Counsel's exceptions (which we have, for the most part), Bar Counsel urges us to impose a 60-day suspension. Although acknowledging that the case is "not on all fours," Bar Counsel suggests that *Attorney Grievance Commission v. Thompson*, 462 Md. 112 (2018), is instructive. In that case, we imposed a 60-day suspension in a disciplinary proceeding involving an attorney who was only licensed in the District of Columbia and maintained a "systematic and continuous presence" for the practice of law in Maryland by using her home address and a mail drop box address for business purposes. In addition to the Rule 5.5(b) violation, we upheld additional violations of Rules 1.1, 1.3, 1.4, 1.5(a), 1.15 (a), (b), (c) and (d), 1.16(d) in connection with client-related matters, as well as violations of Rules 8.1(a) and (b) and 8.4(a), (b), and (d) associated with the disciplinary proceedings. Given the additional rule violations present in *Thompson*, and the significant mitigating factors present here, we are not persuaded that this case is instructive.

Bar Counsel also directs us to *Attorney Grievance Commission v. Harris-Smith*, 356 Md. 72 (1999), where we imposed a 30-day suspension where the attorney violated Rule 5.5(a). In that case, Ms. Harris-Smith was licensed to practice law in Pennsylvania, Virginia, and the District of Columbia, and was admitted to practice before the United States District Court for the District of Maryland. She maintained a principal office for the practice of law for approximately three years in Maryland, where she shared a practice with three attorneys, two of whom were admitted to the Maryland Bar. The law firm promoted

48

itself through radio and newspaper advertising. The radio advertisements "targeted those listeners for whom filing for bankruptcy was likely to be appropriate, yet [the advertisements] did not state that [Harris-Smith's] practice was limited to bankruptcy law [and matters arising within the Maryland federal court]." *Id.* at 76. Ms. Harris-Smith's role was to "prescreen" (a term she used) prospective clients. When she determined that a client's matter involved bankruptcy law, she proceeded to represent the client without the supervision of a Maryland attorney. When representation in a state court was required, however, she would refer the client to one of the firm's other attorneys admitted in Maryland.

Based upon this conduct, we concluded that Ms. Harris-Smith violated Rule 5.5(a). We imposed a 30-day suspension based in part on the following factual considerations: (1) that Ms. Harris-Smith did not represent clients in Maryland state court proceedings; (2) that she was admitted to the Maryland federal court and made some effort to conduct her practice in Maryland within the practice limits associated with her admission to the federal court; and (3) that once Bar Counsel commenced its investigation, Ms. Harris-Smith moved her office from Maryland to the District of Columbia. We determined that a 30-day suspension was sufficient to "deter other unadmitted attorneys from undertaking a federal practice from an office in Maryland from which the non-admitted attorney would hold himself or herself out to the public as generally practicing law in order to identify cases that the attorney was authorized to handle." *Id.* at 91.

In this case, the only rule violations that Bar Counsel has proven are the violation of Rule 5.5(a) arising from the filing of the Yenchochic lines, and the violations of Rule

49

5.5(b) related to Ms. Jackson's physical presence in Maryland. The Rule 5.5(a) violation relating to the lines seeking reissuance of a summons occurred in 2012—some six years prior to Bar Counsel's investigation and before Ms. Jackson moved her office to Maryland. The hearing judge found that the lines were filed during a tumultuous time in Ms. Jackson's life where an accidental filing of this nature was certainly understandable. Bar Counsel did not establish any other conduct by Ms. Jackson that constituted the unauthorized practice of law in Maryland. To the contrary, as the hearing judge observed, all the witnesses who testified in this case—including those witnesses called by Bar Counsel—confirmed that Ms. Jackson has never held herself out to be a Maryland lawyer, nor has she ever represented a client in a Maryland court. She limited her practice to matters arising in the District of Columbia.

As for the violations of Rule 5.5(b), Ms. Jackson promptly placed the appropriate jurisdictional limitations on the firm website, letterhead, her business card, and email signature after Senior Assistant Bar Counsel recommended that she do so. And we cannot ignore the fact that the Office of Bar Counsel knew that Ms. Jackson was practicing from an office in Maryland and *gave her specific recommendations for how to maintain her practice*. Ms. Jackson complied with Bar Counsel's suggestions. Having done so, it was reasonable for Ms. Jackson to assume that her physical presence in Maryland was not an issue. Had Ms. Ridgell raised any concern with Ms. Jackson at their meeting in June 2015 about her office location, given Ms. Jackson's record of compliance with Bar Counsel, there is no reason, based on the record in this case, to believe that she would not have addressed any concerns related to her physical presence at that time. After Bar Counsel commenced its

50

investigation, Ms. Jackson opened an office in the District of Columbia. The hearing judge found that Ms. Jackson has been cooperative and forthcoming with the Office of Bar Counsel and has attempted to comply with its directives. Given the significant delay in the investigation of this matter and the specific recommendations made by Bar Counsel, as well as the presence of the other considerable mitigating factors, we exercise our discretion and determine that no sanction is appropriate in this case.

Having determined that no sanction is appropriate in this case, we dismiss this case pursuant to Maryland Rules 19-740(c)(1)(F) and 19-706(a)(6). Given that we have dismissed this case, this matter shall not be construed as an adverse disciplinary action by this Court. Ms. Jackson shall continue to have no history of prior discipline in Maryland.

**IT IS SO ORDERED; PETITIONER SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT UNDER THE DISMISSAL ORDERED BY THE COURT.**